Cianflone v Carmel Richmond Nursing Home, Inc. (2024 NY Slip Op 51144(U))

[*1]

Cianflone v Carmel Richmond Nursing Home, Inc.

2024 NY Slip Op 51144(U)

Decided on August 30, 2024

Supreme Court, Richmond County

Castorina, Jr., J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 30, 2024
Supreme Court, Richmond County

Joseph Cianflone, As Administrator of the 
 Estate of ROSE CIANFLONE, Deceased, Plaintiff,

against
Carmel Richmond Nursing Home, Inc., CARMEL RICHMOND NURSING HOME, INC. d/b/a ARCHCARE AT CARMEL RICHMOND HEALTHCARE AND REHABILITATION CENTER, CATHOLIC HEAL CARE SYSTEM, 
 STATEN ISLAND UNIVERSITY HOSPITAL and NORTHWELL HEALTH, INC., Defendant.

Index No. 150202/2022

Attorneys for the Plaintiff
Brett Ryan Leitner, Esq. 
Leitner Varughese Warywoda PLLC 
425 Broadhollow Rd Ste 417
Melville, NY 11747 
Phone: (212) 671-1110 
E-mail: bleitner@lvlawny.com
Attorneys for the Defendants
Jonathan Waldauer, Esq.
Rubin Paterniti Gonzalez Rizzo Kaufman LLP
800 3rd Ave Ste 902
New York, NY 10022 
Phone: (646) 503-5184 
E-mail: waldauer@rpgrklaw.com
Steven I. Rubin, Esq.
Rubin Paterniti Gonzalez Rizzo Kaufman LLP 
1225 Franklin Avenue, Ste. 200
Garden City, NY 11530 
Phone: (546) 340-1174 E-mail: rubin@rpgrklaw.com
Regina Marie Sagesser, Esq.
Rubin Paterniti Gonzalez Rizzo Kaufman LLP 
1225 Franklin Ave Ste 200
Garden City, NY 11530 
Phone:(516) 340-1125 
E-mail: sagesser@rpgklaw.com
Sarah Jane Bruno, Esq.
Rubin Paterniti Gonzalez Rizzo Kaufman LLP 
800 3rd Ave Fl 9
New York, NY 10022 
Phone: (646) 846-3437 
E-mail: bruno@rpgrklaw.com
Karen S. Hauss, Esq.
Vaslas Lepowsky & Hauss LLP 
201 Edward Curry Ave
Staten Island, NY 10314 
Phone: (718) 761-9300 
E-mail: khauss@vlhd-law.com
Edward Francis Humphries, Esq.
Vaslas Lepowsky & Hauss LLP
201 Edward Curry Ave Ste 100
Staten Island, NY 10314 
Phone: (718) 761-9300 
E-mail: ehumphries@vlhd-law.com
Ian Miles Nerlfi, Esq.
Vaslas, Lepowsky, & Hauss LLP 
201 Edward Curry Ave Ste 100
Staten Island, NY 10314 
Phone: (718) 761-9300 
E-mail: inerlfi@vlhd-law.com

Ronald Castorina, Jr., J.

The following e-filed documents listed on NYSCEF (Motion #002) numbered 73-82, 86, 90-98 were read on this motion.
Upon the foregoing documents, and after oral argument completed on August 22, 2024, it is hereby,
ORDERED, that the Defendants' request for dismissal of Plaintiff's complaint pursuant to CPLR § 3211 [a] [1] and § 3211 [a] [7] upon the ground that Defendant is immune from [*2]liability under New York's Emergency or Disaster Treatment Protection Act, NY Pub. Health Law §§ 3080-82 is DENIED with prejudice, and it is further;
ORDERED, that the Defendants' request for the dismissal of the complaint pursuant to CPLR § 3211 [a] [2] and CPLR § 3211 [a] [7] on the ground that Defendant is immune from suit and liability under the federal Public Readiness and Emergency Preparedness Act, 42 USC § 247d-6d, et seq, is DENIED with prejudice, and it is further;
ORDERED, that the Clerk of the Court shall enter judgment accordingly.
 Memorandum Decision

 I. Procedural History
On or about February 2, 2022, Plaintiff, as Administrator of the Estate of the Decedent, Rose Cianflone, commenced this action to recover for claims of negligence and gross negligence, arising from allegations of failures in patient care that resulted in the death of Rose Cianflone [hereinafter "Decedent"].
Defendant filed Motion Sequence No. 002 on May 8, 2024, seeking (a) pursuant to CPLR § 3211 [a] [1] and § 3211 [a] [7], dismissal of the relevant portions of Plaintiff's complaint with prejudice on the ground that defendants are immune under New York's Emergency or Disaster Treatment Protection Act (hereinafter referred to as "EDTPA") NY Pub. Health Law §§ 3080-82, and Federal Public Readiness and Emergency Preparedness Act (hereinafter referred to as "PREP Act") 42 USC § 247d-6d, et seq; and (b) for such other and further relief as this the Court deems just and proper.
On May 29, 2024, Plaintiff filed opposition to Motion Sequence No. 002. Defendant filed reply on August 21, 2024. Oral argument was heard in person, at the courthouse on August 22, 2024.

II. Facts
Plaintiff alleges negligence in the care and treatment of the Decedent by Defendants' failure to properly assess, monitor, and treat Decedent's sacral ulcer, a condition which was present upon her admission on February 24, 2020, prior to the COVID pandemic. The ArchCare Carmel Richmond HealthCare & Rehab Center Resident Face Sheets completed on February 24, 2024, provides that among Decedent's diagnoses, Plaintiff was diagnosed with a "Pressure ulcer of sacral region, stage 3" (NY St Cts Filing [NYSCEF] Doc No. 78). Gina Esposito (hereinafter referred to as GE), employed by Defendant Carmel Richmond Nursing Home, Inc., (hereinafter referred to as CRNH) as an administrator testified that the Decedent "was admitted with existing skin issues" (NY St Cts Filing [NYSCEF] Doc No. 81 at page 28, lines 2-3).
GE testified regarding her interactions with the Decedent that
A. I would see her a minimum of weekly during wound rounds, and I would assist the physician and nurse to turn her, if she allowed us, and assess the wound.
Q. Are you referring to her sacral wound?
A. At the time, yes. She came in with that. So, that's what we initially started looking at her for.
Q. And then, in your review of the record did she develop another wound during her time [*3]at Carmel Richmond?
A. Yes. I think on one of her heels. (NY St Cts Filing [NYSCEF] Doc No. 81 at page 28-29).
GE further testified that according to the assessment completed on February 24, 2020, Decedent was at moderate risk for the development of pressure ulcers. (NY St Cts Filing [NYSCEF] Doc No. 81 at Page 47, lines 15-22). GE was questioned regarding the size and scale of Decedents sacral wounds.
Q. What is this push tool on Med Rec Page 366, what does it indicate with regard to the sacral wounds on February 24, 2020?
A. It gives you the way in which it was measured, the type of tissue that was observed, and the state in which the wound was.
Q. So, on the top grid is a measurement of length 3 by width 2, right?
A. Yes.
Q. And that's centimeters. And then it indicates a depth of .1 and a total score of 8. What does the score mean in terms of 
A. I don't know.
Q. Is there a key that, you know, in terms of the ability of the wound to heal or, you know, what is the pressure ulcer scale for healing, if you know?
A. I don't know.
Q. Do you know what the purpose of this push tool is?
A. To measure the healing or deterioration of a wound.
Q. And then there's a section underneath the push that says pressure ulcer site number, stage, tunneling, undermining. Do you see that?
A. Yes.
Q. And on February 24, 2020 it was indicated that the stage of the sacral wound was unstageable?
A. Yes. (NY St Cts Filing [NYSCEF] Doc No. 81 at page 50-51)
Q. Going back to Nurse Bethea's note on February 24th, which is Page 1338. She writes, "Stage 2 pressure ulcer noted on sacrum." Are you able to tell from reading her note whether she independently assessed the wound and determined it was a Stage 2?
A. I could make the assumption that that happened because the next sentence says, "In for PMD to evaluate."
Q. What does that mean, "In for PMD to evaluate?"
A. So, basically there's a communication out there for the primary doctor to evaluate what she just said. (NY St Cts Filing [NYSCEF] Doc No. 81 at page 80-81)
GE testified that Decedent's report of the push tool on February 24, 2020, indicated epithelial tissue, meaning no breakdown or intact. (NY St Cts Filing [NYSCEF] Doc No. 81 at page 70, lines 2-12). Four days later on February 28, 2020, it is documented that slough, necrotic or dead tissue was present. (see id at lines 13-22) and Dr. William Schmalz staged the wound as Stage 3. (NY St Cts Filing [NYSCEF] Doc No. 81 at page 72). This assessment also provided that the patient also has the risk factor of limited mobility, which might contribute to the worsening of the pressure injury. (see id at page 73).
GE was further questioned,
Q. Do you know what that means, that limited mobility could contribute to the worsening of the pressure injury?
A. If she doesn't move around a lot, so it may get worse.
Q. And why is that?
A. Well, according to anatomy and if the blood isn't circulating and — that would contribute to the  you know, deterioration or the wound not healing.
Q. I guess what I mean is, limited  when the assessment is talking about limited mobility might contribute to the worsening of the pressure injury, does that refer to increased pressure on that area may deteriorate the wound? (NY St Cts Filing [NYSCEF] Doc No. 81 at page 73, lines 11-25; at 74, line 2).
A. Yes.
Q. And then if you go down a few sentences there's a sentence for offloading and it's written, "Continue offloading, turn per facility protocol, continue low air loss mattress." Do you see that?
A. Yes.
Q. What is low air loss mattress?
A. The air mattress overlay I referred to.
Q. What makes you believe that the mattress overlay that Carmel Richmond provided was a low air loss mattress?
A. I mean, just reading the sentence it says low air loss mattress. The air mattress overlay that we use is plugged in so the air is maintained. That's why I believe that.
Q. Did Dr. Schmalz or the other wound physician in your practice that you know of, ever recommend a bed or a mattress other than the overlay that Carmel used?
A. Not that I'm aware of. (NY St Cts Filing [NYSCEF] Doc No. 81 at 74, lines 3-25).
Q. [I]f we look at this care plan there's an entry by a Michelle Riggi, RN?
A. Yes. (NY St Cts Filing [NYSCEF] Doc No. 81 at 81, lines 22-25).
Q. It looks like she made an entry on February 25, 2020?
A. Yes.
Q. She documented a Stage 2 sacral wound?
A. Yes.
Q. I believe we have three separate RNs who documented a Stage 2 sacral wound either on February 24th or February 25th. Do you have any reason to believe that Ms. Cianflone did not have a Stage 2 sacral wound on admission?
A. Do I have any reason to believe that she did not have a Stage 2?
Q. Other than that there was an order for SANTYL, as you described?
A. Yeah. I could just go based off of my recollection of when I observed the wound, and it wasn't a Stage 2 at the time I seen it. That's really it.
Q. As a wound care nurse, can a wound deteriorate within a matter of four days from a Stage 2 wound to a more advanced wound, like a Stage 3?
A. I personally think that's — or professionally think that's very quick, and I have not seen that in my experience. (NY St Cts Filing [NYSCEF] Doc No. 81 at 82, lines 4-25; at 83, lines 3-6).
Q. For instance, on Page 106, Bates-stamped, on the top for interventions it says provide pressure relieving devices as appropriate, and that was entered by Nurse Riggi on February 25, 2020.
A. Yes.
Q. That doesn't mention whether pressure relieving device should be implemented, right?
A. Not there, no.
Q. But if you go to the preceding Page 105, it says provide pressure relieving devices as appropriate, and then underneath there it says has air mattress and wheelchair cushion.
A. Yes.
Q. And that was entered the following day on February 26, 2020?
A. Yes.
Q. Are you able to tell when Ms. Cianflone was initially provided the air mattress and wheelchair cushion?
A. Not according to the care plan.
Q. First time we see that entered is February 26th, two days after admission?
A. In the care plan, yes. (NY St Cts Filing [NYSCEF] Doc No. 81 at 85, lines 14-25; at 86, lines 2-15).
Q. Do you see anything on this care plan on admission as to turning and positioning?
A. Yes.
Q. Where is that? What page?
A. Can you repeat what you asked?
Q. Yes. On the care plan, whether the skin integrity care plan that we're looking at or any other, is there any entry as to turning and positioning being ordered?
A. On that specific care plan or any?
Q. Basically I want to find out when the first care plan mention of turning and positioning is?
A. Okay. (NY St Cts Filing [NYSCEF] Doc No. 81 at 87, lines 9-25).
Q. Were you able to find when the first mention of turning and positioning in the care plan was?
A. I was not. It's difficult to see with all the  no, I was not able to. (NY St Cts Filing [NYSCEF] Doc No. 81 at 88, lines 2-6).
Q. So, according to this document, it looks like turning and positioning was inactive on February 24, 2020? On the top line.
A. Yes.
Q. It looks like on March 2nd it was changed to active?
A. Yes. (NY St Cts Filing [NYSCEF] Doc No. 81 at 89, lines 9-16).
Q. In your review of the records of Ms. Cianflone before the deposition and what we talked about so far during the deposition, should turning and positioning have been implemented on admission on February 24th?
A. Yes.
Q. Do you have any knowledge as to why it was not?
A. I don't. (NY St Cts Filing [NYSCEF] Doc No. 81 at 89, lines 9-16).
Q. Dr. Schmalz ordered on February 28th or recommended continue offloading by turning pursuant to the facility protocol, could that have been started on February 28th?
A. It wasn't because it says continue.
Q. We know that it wasn't in the care plan and it wasn't in the resident nurse instructions until later. Do you know whether turning and positioning was started by this time on February 28th?
A. I'm just looking at the record. I don't. I can't locate it in the chart. (NY St Cts Filing [NYSCEF] Doc No. 81 at 99, lines 8-22).
Q. Are you able to tell when turning and positioning, if at all 
A. It's probably March 2nd[.] (NY St Cts Filing [NYSCEF] Doc No. 81 at 100, lines 10-12).
Q. Where can we look in the chart to determine whether Ms. Cianflone was ever provided any sort of pressure relief like pillows for her heels?
A. You asked me can we look in the chart or did I find it?
Q. Is that supposed to be noted somewhere in the chart or documented that the CNAs were doing that?
A. Possibly. I'm not sure.
Q. To your knowledge, did there come a time when Ms. Cianflone developed a wound to her heel?
A. Yes. (NY St Cts Filing [NYSCEF] Doc No. 81 at 106, lines 12-25).
Q. Where can we look to determine when that was first found?
A. Page 370, PDF.
Q. And that is an assessment document that was performed?
A. Yes.
Q. What does this indicate, this pressure ulcer chart?
A. The left heel on May 6th there was some type of breakdown identified. (NY St Cts Filing [NYSCEF] Doc No. 81 at 107, lines 2-11).
Q. So, for May 8th the surgical note by the wound physician on Page 1001, that indicates a sacral wound and it was Stage 3, on the bottom of the form. Do you see that?
A. Yes.
Q. Can we go back to that push tool for the sacrum?
A. Yes.
Q. It appears on that push tool that every time the sacral ulcer was staged it was staged as unstageable until May 29th when it is staged as a Stage 4. Do you see that?
A. I see that.
Q. Do you know why there's a conflict between what the wound consultant was staging the sacral wound and this push tool?
A. No, I don't know why there's a conflict. (NY St Cts Filing [NYSCEF] Doc No. 81 at 114-115).
The Plaintiff's complaint contends negligence and gross negligence arising from alleged failures in patient care which resulted in the Decedent's suffering and death. The testimony provided by GE documents the decline in the Decedent's condition relating to the sacral ulcer and pressure ulcer on her heel. Neither GE's testimony, nor the evidence provided by the Defendants addresses, or even mentions, whether or how the COVID-19 outbreak prevented the nursing home from providing Decedent with the rudimentary mandated pressure-relieving measures.
Defendants contend that the portions of Plaintiff's complaint relating to care and treatment provided to the Decedent, from March 7, 2020, through June 3, 2020, at CRNH should be dismissed because of the immunity from liability conferred by New York's Emergency or Disaster Treatment Protection Act, NY Pub. Health Law §§ 3080-82 and the federal Public Readiness and Emergency Preparedness Act, which requires dismissal of any claim involving care that was impacted by acts or decisions by healthcare providers and facilities in response to the COVID-19 pandemic, absent narrow exceptions not present here.
III. Emergency or Disaster Treatment Protection Act
CPLR § 3211 [a] [7] provides that a "party may move for judgment dismissing one or more causes of action asserted against him on the ground that the pleading fails to state a cause of action[.]" "In considering a motion pursuant to CPLR 3211 [a] [7] to dismiss a complaint for failure to state a cause of action, the court must accept the facts as alleged in the complaint as true, accord the plaintiff the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (see Green 333 Corp. v RNL Life Science, Inc., 186 AD3d 1334 [2d Dept 2020] citing Cortlandt St. Recovery Corp. v Bonderman, 31 NY3d 30 [2018]; Korsinsky v Rose, 120 AD3d 1307 [2d Dept 2014]).
Where "evidentiary material is submitted and considered on a motion pursuant to CPLR § 3211 [a] [7], and the motion is not converted into one for summary judgment, the question becomes whether the plaintiff has a cause of action, not whether the plaintiff has stated one, and unless it has been shown that a material fact claimed by the plaintiff to be one is not a fact at all, and unless it can be said that no significant dispute exists regarding it, dismissal should not eventuate" (see Graphic Arts Mut. Ins. Co. v Pine Bush Cent. Sch. Dist., 159 AD3d 769 [2d Dept 2018] citing Guggenheimer v. Ginzburg, 43 NY2d 268 [1977]; Sposato v Paboojian, 110 AD3d 979 [2d Dept 2013]; Constructamax, Inc. v Dodge Chamberlin Luzine Weber, Assoc. Architects, LLP, 109 AD3d 574 [2d Dept 2013]).
"A court is, of course, permitted to consider evidentiary material submitted by a defendant in support of a motion to dismiss pursuant to CPLR § 3211 [a] [7]" (see Mera v. New York City Health & Hosps. Corp., 2023 NY App Div LEXIS 4951 [2d Dept 2023] quoting Cordell Marble Falls, LLC v Kelly, 191 AD3d 760 [2d Dept 2021] quoting Sokol v Leader, 74 AD3d 1180 [2d Dept 2010] citing CPLR § 3211 [c]).
"If the court considers evidentiary material, the criterion then becomes 'whether the proponent of the pleading has a cause of action, not whether he [or she] has stated one'" (see id quoting Sokol v Leader, 74 AD3d 1180 [2d Dept 2010] quoting Guggenheimer v. Ginzburg, 43 NY2d 268 [1977] citing Cordell Marble Falls, LLC v Kelly, 191 AD3d 760 [2d Dept 2021]).
At the outset of the COVID-19 pandemic the New York State Legislature enacted the Emergency or Disaster Treatment Protection Act (Public Health Law former art 30-D, §§ 3080-3082 [repealed by L 2021, ch 96, § 1]; hereinafter the EDTPA) with the stated purpose of "promot[ing] the public health, safety and welfare of all citizens by broadly protecting the health care facilities and health care professionals in this state from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstances associated with the public health emergency" (see id quoting Public Health Law former § 3080).
[T]he EDTPA initially provided, with certain exceptions, that a health care facility "shall have immunity from any liability, civil or criminal, for any harm or damages alleged to have been sustained as a result of an act or omission in the course of arranging for or providing health care services" as long as three conditions were met: [1] the services were arranged for or provided pursuant to a COVID-19 emergency rule or otherwise in accordance with applicable law; [2] the act or omission was impacted by decisions or activities that were in response to or as a result of the COVID-19 outbreak and in support of the State's directives; and [3] the services were arranged or provided in good faith (see id quoting former PHL § 3082 [1]).
The health care services covered by the immunity provision included those related to the [*4]diagnosis, prevention, or treatment of COVID-19; the assessment or care of an individual with a confirmed or suspected case of COVID-19; and the care of any other individual who presented at a health care facility or to a health care professional during the period of the COVID-19 emergency declaration (see id former PHL § 3081 [5]).
The only exception under the statute is for injuries caused by "willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm" (see former PHL § 3082 [2]).
The "Court of Appeals has held that the failure to exercise even 'slight care' or 'slight diligence' constitutes gross negligence (see Gentile v. Garden City Alarm Co., 147 AD2d 124 [2d Dept 1989] citing Food Pageant, Inc. v. Consolidated Edison Co., 54 NY2d 167 [1981]; Dalton v. Hamilton Hotel Operating Co., 242 NY. 481 [1926]; Weld v. Postal Tel. Cable Co., 210 NY 59 [1913]). "To constitute gross negligence, a party's conduct must 'smack[ ] of intentional wrongdoing' or 'evince[ ] a reckless indifference to the rights of others'" (see Bennett v State Farm Fire & Cas. Co., 161 AD3d 926 [2d Dept] quoting Ryan v IM Kapco, Inc., 88 AD3d 682 [2d Dept 2011] quoting Sommer v. Federal Signal Corp., 79 NY2d 540 [1992]; citing Skywest, Inc. v Ground Handling, Inc., 150 AD3d 922 [2d Dept 2017]; J. Petrocelli Contr., Inc. v Morganti Group, Inc., 137 AD3d 1082 [2d Dept 2016]).
"Generally, the question of gross negligence is a matter to be determined by the trier of fact" (see id citing Food Pageant, Inc. v. Consolidated Edison Co., 54 NY2d 167 [1981]; Dolphin Holdings, Ltd. v Gander & White Shipping, Inc., 122 AD3d 901 [2d Dept 2014]).
Decedent was admitted to and was a resident at CRNH from on or about February 24, 2020, through on or about June 3, 2020. (NY St Cts Filing [NYSCEF] Doc No. 75). Plaintiff's allegations include but are not limited to the following: during the Decedent's admission to Defendant's nursing facility, Decedent sustained and/or exacerbated multiple decubitus ulcers including a Stage IV sacral ulcer and unstageable ulcer on her foot, infections, malnutrition, dehydration, and other injuries, due to the negligent acts and omissions of Defendants. (see id). Plaintiff further alleges that Decedent's injuries were substantially contributed to by the negligent acts and/or omissions of the Defendants. (see id).
Plaintiff makes no allegations pertaining Defendant's implementation or execution of COVID-19 protocols. Defendants provide neither testimony nor evidence that demonstrates even in the most tangential way how the COVID-19 pandemic prevented or impaired the Defendants from providing Decedent with treatment for her ulcers and open wounds. Defendants rely solely on the argument that the EDTPA was valid at the time of the occurrence and provide no correlation between the treatment of Decedent's ulcers and open wounds and how [1] the services were arranged for or provided pursuant to a COVID-19 emergency rule or otherwise in accordance with applicable law; [2] the act or omission was impacted by decisions or activities that were in response to or as a result of the COVID-19 outbreak and in support of the State's directives; and [3] the services were arranged or provided in good faith. (see PHL former § 3082 [1]).
"While the EDTPA 'immunized healthcare facilities from civil liability for certain acts or omissions in the treatment of patients for COVID-19 during the period of the COVID-19 emergency declaration' (see Martinez v NYC Health & Hosps. Corp., 223 AD3d 731 [2d Dept 2024), the defendant's submissions did not establish that the three requirements for immunity were satisfied (see Damon v. Clove Lakes Healthcare & Rehabilitation Ctr., Inc., 228 AD3d 618 [2d Dept 2024]; citing PHL former § 3082 [1]; Mera v New York City Health & Hosps. Corp., [*5]220 AD3d 668 [2d Dept 2023]). Defendants here have equally failed to establish the three requirements for immunity.
Accordingly, Defendants' request for dismissal of the relevant portions of Plaintiff's complaint pursuant to CPLR § 3211 [a] [1] and § 3211 [a] [7] upon the ground that Defendant is immune from liability under New York's Emergency or Disaster Treatment Protection Act, NY Pub. Health Law §§ 3080-82 is DENIED with prejudice.
IV. Public Readiness and Emergency Preparedness Act
The PREP Act was enacted in 2005 and is invoked when the Secretary of Health and Human Services determines that a disease or health condition exists that constitutes a public health emergency (42 USC § 247d-6d[b]). Thereafter, the Secretary "may make a Declaration through publication in the Federal Register, recommending ... the manufacture, testing, development, distribution, administration, or use of one or more covered countermeasures." This was done to address the COVID-19 pandemic (Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, (85 Fed Reg 15 198 [March 10, 2020]).
When enacting the PREP Act, which can cut off an injured individual's ability to seek recourse through the courts, Congress recognized the need to include an alternative form of relief for individuals injured by covered countermeasures. Under the PREP Act, a "covered countermeasure" is a drug, biological product, or device that is a "qualified pandemic or epidemic product" or a "security countermeasure" or is "authorized for emergency use by the Federal Food, Drug, and Cosmetic Act. The PREP Act does not define "administration" and "use," but the Secretary's Declaration states that "administration" of covered countermeasures "means physical provision of countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution and dispensing of countermeasures to recipients, management and operation of countermeasure programs, or management and operation of locations for purpose of distributing and dispensing countermeasures." The PREP Act provides that "[s]ubject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure." (see 42 USC § 247d-6d [a] [1]).
The immunity provided under the PREP Act "applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure." (see 42 USC § 247d-6d [a] [2] [B]). Immunity under the PREP Act applies to any loss or claim that has a causal relationship to the administration to or use by a "covered person" arising out of or relating to the administration of a covered countermeasure (42 USC § 247d-6d(a)(1), with the exception to immunity being "death or serious physical injury proximately caused by willful misconduct." A claim falling under the PREP Act must be filed in federal court, and the Act creates a fund known as the Covered Countermeasure Process Fund ("CCPF") for "purposes of providing timely, uniform, and adequate compensation to eligible [*6]individuals for covered injuries" (42 USC § 247d-6e[a]) (See Whitehead v Pinehead Operating, LLC, 75 Misc 3d 985 [Sup Ct Columbia County 2022]). 
The only exception to the PREP Act's grant of immunity is "for death or serious physical injury proximately caused by willful misconduct" (see 42 USC § 247d-6d [d] [1]), defined as an act or omission that is taken (i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit (see 42 USC § 247d-6d [c] [1] [A]). Under 42 USC § 247d-6d(d)(1), immunity is not available when willful misconduct is the proximate cause of death or serious physical injury. Any such case must be brought in the District Court for the District of Columbia, no matter where the harm occurred. The burden of proving proximate cause is on the plaintiff. The standard is clear and convincing evidence. The advisory opinion notes that the PREP Act does not confer immunity against federal enforcement actions, whether civil, criminal, or administrative. For activities undertaken under a federal contract, the period of immunity lasts until October 1, 2024. Once the declaration expires, covered entities have 12 months of liability protection to dispose of Covered Countermeasures.
Plaintiff's claims are not encompassed by the PREP Act. Here, the Plaintiff's claims do not allege loss "caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." (see 42 USC § 247d-6d(a)(1)). Plaintiff alleges claims of negligence and gross negligence arising from alleged failures in patient care which resulted in the Decedent's suffering and death. (NY St Cts Filing [NYSCEF] Doc No. 75).
The acts and omissions listed in the complaint are unrelated to the administration, prioritizing, or purposeful allocation of a drug, biological product, or device to an individual within the meaning of the PREP Act. There are no allegations in the Complaint that allege causal connection between the Resident's injuries and the administration of a covered countermeasure. Further, Defendants do not allege any facts, nor were they able to articulate any argument as to whether there were staffing issues resulting from the COVID-19 pandemic that resulted in a lower standard of care for their patients. 
Defendant contends that the facts of this case fit squarely into the criteria for immunity under the EDTPA and PREP Act as it is clear the plaintiff's decedent's care was impacted by CRNH's decisions and activities in response to the COVID-19 pandemic but fails to provide any specifics, and absolutely no facts, as to how the Decedent's ulcer and open wound care was impacted by the Defendants' response to the pandemic merely reiterating that the medical decisions at issue arose during the period when both the EDTPA and PREP Act immunities were in effect, providing no rational basis for the relief they seek. 
Defendants contend that that the PREP Act provides immunity for injuries relating to the "administration" of covered countermeasures and does not require that the covered countermeasure directly cause the injury alleged. (NY St Cts Filing [NYSCEF] Doc No. 74). Defendants maintains that the allegations in Plaintiff's complaint relate to the administration of covered countermeasures by CRNH but the Defendants fail to provide any credible evidence or explanation as to how the allegations in Plaintiff's complaint relate to the administration of covered countermeasures.
Accordingly, the Defendants' request for the dismissal of the complaint pursuant to CPLR § 3211 [a] [2] and CPLR § 3211 [a] [7] on the ground that Defendant is immune from suit and liability under the federal Public Readiness and Emergency Preparedness Act, 42 USC § 247d-[*7]6d, et seq, is DENIED with prejudice.
Decretal Paragraphs
ORDERED, that the Defendants' request for dismissal of Plaintiff's complaint pursuant to CPLR § 3211 [a] [1] and § 3211 [a] [7] upon the ground that Defendant is immune from liability under New York's Emergency or Disaster Treatment Protection Act, NY Pub. Health Law §§ 3080-82 is DENIED with prejudice, and it is further;
ORDERED, that the Defendants' request for the dismissal of the complaint pursuant to CPLR § 3211 [a] [2] and CPLR § 3211 [a] [7] on the ground that Defendant is immune from suit and liability under the federal Public Readiness and Emergency Preparedness Act, 42 USC § 247d-6d, et seq, is DENIED with prejudice, and it is further;
ORDERED, that the Clerk of the Court shall enter judgment accordingly.
The foregoing shall constitute the Decision and Order of this Court. 
Dated: August 30, 2024
Staten Island, New York
E N T E R,
HON. RONALD CASTORINA, JR.
JUSTICE OF THE SUPREME COURT